IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

VIRGINIA L. SHOWERS,                  :   CIVIL ACTION NO. 1:13-CV-1146
                                      :
            Plaintiff                 :   (Chief Judge Conner)
                                      :
      v.                              :
                                      :
ENDOSCOPY CENTER OF CENTRAL           :
PENNSYLVANIA, LLC *et al.*,           :
                                      :
            Defendants                :

## MEMORANDUM

Plaintiff Virginia Showers brings the above-captioned action pursuant to the

Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the

Pennsylvania Human Relations Act ("PHRA"), 43 PA. STAT. ANN. § 951 *et seq.*

Showers alleges that Endoscopy Center of Central Pennsylvania, LLC and

Gastroenterology Associates of Central Pennsylvania, P.C. (collectively,

"defendants") unlawfully discriminated against and terminated her on the basis of

her disability.   Presently before the court is defendants' motion (Doc. 15) for

summary judgment.  For the reasons that follow, the court will grant the motion.

I.   <u>Factual Background and Procedural History</u>[1]

From 2005 to 2011, Virginia Showers ("Showers") worked at Endoscopy

Center of Central Pennsylvania, LLC ("ECCP") as a receptionist.  (Doc. 16 ¶¶ 3, 97;

Doc. 20 ¶¶ 3, 97).  ECCP is a licensed ambulatory surgical center in Hershey,

Pennsylvania.  (Doc. 16 ¶¶ 123, 129; Doc. 20 ¶¶ 123, 129).  Dr. William A. Rowe

("Dr. Rowe") and Dr. Robert F. Werkman ("Dr. Werkman") are the sole members

and managers of ECCP.  (Doc. 16 ¶ 128; Doc. 20 ¶ 128).  Dr. Werkman also serves

as the state-mandated Medical Director of ECCP.  (Doc. 16 ¶ 133; Doc. 20 ¶ 133).

Prior to her employment at ECCP, Showers worked as a receptionist at

Gastroenterology Associates of Central Pennsylvania, P.C. ("GACP").  (Doc. 16 ¶ 1;

Doc. 20 ¶ 1).  According to Dr. Rowe, who testified on behalf of ECCP and GACP as

a corporate designee, GACP provides patient care in the fields of gastroenterology

and hepatology.  (Doc. 19-2, Rowe Dep. at 9:2-21, Feb. 20, 2014 ("Designee Dep.")).

Dr. Rowe and Dr. Werkman are board members and 50-percent shareholders of

GACP.  (Doc. 16 ¶ 127; Doc. 20 ¶ 127).  Victoria Farr ("Farr") served as the Center

Director of ECCP, while Shirley Nye ("Nye") served as the Officer Manager of

---

[1] Local Rule 56.1 provides that "[a] motion for summary judgment filed
pursuant to FED. R. CIV. P. 56 shall be accompanied by a separate, short and concise
statement of the material facts, in numbered paragraphs, as to which the moving
party contends there is no genuine issue to be tried."  L.R. 56.1.  A party opposing a
motion for summary judgment shall file a separate statement of material facts,
responding to the numbered paragraphs set forth in the moving party's statement of
material facts and noting genuine issues to be tried.  <u>Id.</u>  Unless otherwise noted,
the factual information contained herein is derived from the parties' statements of
material facts.  (Docs. 16, 20).  To the extent that facts are undisputed or supported
by record evidence, the court cites directly to both parties' statements of material
facts.

GACP.  (Doc. 16 ¶ 130; Doc. 20 ¶ 130).   In the area of human resources, Farr

managed minor disciplinary issues at ECCP, and ECCP's Governing Board made

major disciplinary decisions.  (Doc. 16 ¶ 19; Doc. 20 ¶ 19).   ECCP's Governing Board

consists of Dr. Rowe, Dr. Werkman, and Farr.  (Doc. 16 ¶ 19; Doc. 20 ¶ 19).

ECCP and GACP are located in the same building and lease their offices from

GI Properties of Hershey, LLP.  (Doc. 16 ¶¶ 140-41; Doc. 20 ¶¶ 140-41).   Dr. Rowe

and Dr. Werkman own GI Properties.  (Doc. 16 ¶ 140; Doc. 20 ¶ 140).   Defendants

state that ECCP and GACP have separate reception and work areas (Doc. 16 ¶ 141),

while Showers posits that ECCP and GACP share bathrooms, a locker room, and a

lunchroom (Doc. 20 ¶ 141).   ECCP outsources certain services to GACP pursuant to

a management agreement, including billing, bookkeeping, and the Medical Director

position.  (Doc. 16 ¶¶ 134, 142; Doc. 20 ¶¶ 134, 142).   ECCP and GACP were

separately established approximately two years apart.  (Doc. 16 ¶¶ 125-26; Doc. 20

¶¶ 125-26).   Dr. Rowe and Dr. Werkman refer patients to surgical centers other

than ECCP but perform approximately 90 percent of their procedures at ECCP.

(Doc. 16 ¶¶ 138-39; Doc. 20 ¶¶ 138-39; Designee Dep. at 41:15-42:15).

ECCP terminated Showers's employment in June 2011.  (Doc. 16 ¶ 97; Doc.

20 ¶ 97).   At the time of her termination, ECCP had six full-time employees and five

part-time employees.  (Doc. 16 ¶ 131; Doc. 20 ¶ 131).   At that same time, GACP had

ten full-time employees and no part-time employees.  (Doc. 16 ¶ 131; Doc. 20 ¶ 131).

Showers does not allege that GACP discriminated against her (Doc. 16 ¶ 146; Doc.

20 ¶ 146), although she notes that Dr. Rowe and Dr. Werkman maintain control over major personnel decisions for both ECCP and GACP (Doc. 20 ¶ 147).

Showers's job responsibilities at ECCP included greeting patients, answering phone calls, and maintaining the confidentiality of patient and employee information. (Doc. 16 ¶ 4; Doc. 20 ¶ 4). Her regular work hours were from 6:45 a.m. to 2:45 p.m. (Doc. 16 ¶ 3; Doc. 20 ¶ 3). As Center Director, Farr supervised Showers. (Doc. 16 ¶ 5; Doc. 20 ¶ 5). Showers's employment at ECCP was governed by an employee handbook that provided applicable policies and procedures. (Doc. 16 ¶ 7; Doc. 20 ¶ 7). With respect to ECCP's attendance and call-off policy, the handbook stated that "[i]f for any unforeseen reason the employee will be late or needs to report off work, he/she should do so by calling the Center Director [Farr] at least one hour prior to the start of the work shift. The Center Director can be called at home, cell or work." (Doc. 19-1, Showers Dep. Ex. 2 at 17, Jan. 28, 2014 ("Showers Dep.")). Showers contends that, notwithstanding this policy, Farr instructed Showers not to call her before 8:00 a.m. on Farr's days off. (Doc. 20 ¶¶ 11-12, 74, 77). Farr remained the designated contact person unless she notified the staff that another employee would serve as the contact person for a given day. (Doc. 16 ¶ 77; Doc. 20 ¶ 77).

Showers had multiple disciplinary issues during her tenure at ECCP. In 2005, Showers received an oral warning in connection with a HIPPA violation. (Doc. 16 ¶ 14; Doc. 20 ¶ 14). The following year, Showers violated ECCP's confidentiality policy by disclosing a former ECCP employee's contact information.

4

(Doc. 16 ¶ 15; Doc. 20 ¶ 15).  In 2007, Showers violated ECCP's call-off policy by failing to notify Farr of an intended absence.  (Doc. 16 ¶ 17; Doc. 20 ¶ 17).  This disciplinary warning stated that a failure to improve would result in dismissal. (Doc. 16 ¶ 18; Doc. 20 ¶ 18; Showers Dep. Ex. 5).  Showers also received annual performance appraisals.  (Doc. 16 ¶ 23; Doc. 20 ¶ 23).  The Governing Board generally concluded that Showers's performance was satisfactory, subject to documented disciplinary issues.  (Doc. 16 ¶ 28; Doc. 20 ¶ 28).

In January 2011, Showers was diagnosed with colon cancer.  (Doc. 16 ¶ 31; Doc. 20 ¶ 31).  The cancer was surgically removed as part of a curative resection. (Doc. 16 ¶ 31; Doc. 20 ¶ 31).  Showers took a medical leave of absence for approximately six weeks before returning to work on a part-time basis.  (Doc. 16 ¶ 34; Doc. 20 ¶ 34).  She returned to work full-time, without any medical restrictions, in late February 2011.  (Doc. 16 ¶ 34; Doc. 20 ¶ 34).  Showers asserts, however, that Farr had pressured her to return to work early on a full-time basis. (Doc. 20 ¶¶ 37-38).  In the evening of February 23, 2011 Showers's husband called and left three messages on Dr. Rowe's cell phone after obtaining his number from an employee contact list that had Showers brought home.  (Doc. 16 ¶ 60; Doc. 20 ¶ 60; Showers Dep. at 114:2-7).  Showers testified that he did so because Showers had been returning home upset due to Farr's treatment of her.  (Showers Dep. at 131:19-132:10).  As a result of this incident, the Governing Board issued Showers a written warning for insubordination by disclosing purportedly confidential information.  (Doc. 16 ¶¶ 63, 65; Doc. 20 ¶¶ 63, 65; Showers Dep. Ex. 9).  Showers

maintains that there was no policy related to the employee contact list and disputes the validity of the warning.  (Doc. 20 ¶ 64).  Showers's cancer is in remission and requires no further treatment other than annual check-ups.  (Doc. 16 ¶ 39; Doc. 20 ¶ 39).

In April 2011, after experiencing back pain and weakness in her legs, Showers was diagnosed with Guillain–Barré syndrome ("GBS"), which required hospitalization.  (Doc. 16 ¶¶ 40, 42; Doc. 20 ¶¶ 40, 42).  The Governing Board granted Showers's request for an additional medical leave.  (Doc. 16 ¶ 49; Doc. 20 ¶ 49).  After recovering from GBS, Showers's physician authorized her to return to work full-time and without restrictions on May 16, 2011.  (Doc. 16 ¶ 52; Doc. 20 ¶ 52).  Showers contends that—as evidenced by an internal email among Dr. Rowe, Dr. Werkman, and Farr —the Governing Board had concerns about Showers's ability to perform her job duties upon her return from GBS and about whether Showers would be a liability to ECCP.  (Doc. 20 ¶ 54; Doc. 19-3, Farr Dep. Ex. 21, Oct. 24, 2013 ("Farr Dep.")).  After returning from her medical leave, Showers alleges that Farr adopted a more harassing nature toward Showers and constantly criticized her performance.  (Doc. 20 ¶¶ 67, 105).  Showers also avers that Farr frequently called her regarding when Showers would return to work.  (Id. ¶¶ 105, 110).

On June 14, 2011, Showers woke up feeling ill.  (Doc. 16 ¶ 86; Doc. 20 ¶ 86).  She threw up while driving to work and returned home.  (Doc. 16 ¶ 87; Doc. 20 ¶¶ 87, 90).  Between 6:15 a.m. and 6:30 a.m., after returning home, Showers called

and left a message with a part-time nurse regarding her absence.  (Doc. 16 ¶ 90; Doc. 20 ¶ 90).  According to defendants, Farr was scheduled to work that day.  (Doc. 16 ¶ 82).  Showers believed that Farr was not scheduled to work on June 14, 2011, however, and that the nurse was the appropriate employee to contact in Farr's absence.  (Doc. 20 ¶¶ 82, 85, 89).

The Governing Board convened on June 16, 2011 to discuss Showers's purported failure to comply with ECCP's call-off policy two days prior.  (Doc. 16 ¶ 94).  The Board unanimously decided to terminate Showers.  (Doc. 16 ¶ 96).  In so doing, it considered Showers's prior disciplinary warnings.  (Doc. 16 ¶ 95; Doc. 20 ¶ 95).  Farr informed Showers of her termination on June 17, 2011.  (Doc. 16 ¶ 97; Doc. 20 ¶ 97).  Showers contends that Farr manipulated the Governing Board's decision by failing to speak with Showers about her absence on June 14, 2011 and by presenting only her version of the events to the Board.  (Doc. 20 ¶¶ 96, 120).  Showers maintains that Farr was the only person who discriminated against her.  (Doc. 16 ¶ 116; Doc. 20 ¶ 116).

On April 23, 2013, Showers commenced the instant action.  (Doc. 1).  She brings one claim for discrimination on the basis of disability under the ADA and one claim for discrimination on the basis of disability under the PHRA.[2]  On April 3, 2014, defendants moved for summary judgment on both claims.  (Doc. 15).  The motion has been fully briefed and is ripe for disposition.

---

[2] Showers does not appear to advance causes of action for disability-related harassment or retaliation, nor did the parties brief these issues in connection with the instant motion.

## II.   Legal Standard

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A factual dispute is "material" if it might affect the outcome of the action under applicable law, and is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable factfinder to return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  The burden of proof is on the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  "Such affirmative evidence—regardless of whether it is direct or circumstantial—must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001) (quoting Williams v. Borough of W. Chester, 891 F.2d 458, 460-61 (3d Cir. 1989)). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Anderson, 477 U.S. at 250-57; see also FED. R. CIV. P. 56(a), (e).  Only if this threshold is met may the cause of action proceed.  Pappas, 331 F. Supp. 2d at 315.

III.   <u>Discussion</u>

In support of their motion for summary judgment, defendants contend that the court lacks jurisdiction to hear this matter because neither ECCP nor GACP employs the requisite number of individuals to render either liable under the ADA, that ECCP and GACP should not be consolidated to constitute a single employer, that Showers's claims against GACP fail because GACP did not employ her or discriminate against her, that Showers is not disabled within the meaning of the ADA or PHRA and cannot establish her *prima facie* case under either statute, and that Showers has not shown that the reasons for her termination were pretextual. The court will address each of these arguments *seriatim*.

A.   **Single Employer Status**

The ADA provides that no employer "shall discriminate on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). An "employer" under the ADA is defined in relevant part as "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year." Id. § 12111(5)(A).[3]

---

[3] The PHRA defines an "employer" in relevant part as a person who employs more than four employees within Pennsylvania. 43 PA. CONS. STAT. § 954(b). Because both ECCP and GACP employed more than four individual at the time of Showers's termination, the parties do not dispute that Showers satisfies the PHRA's numerosity requirement.

It is undisputed that when Showers was terminated, ECCP had six full-time employees and five part-time employees, while GACP had only ten full-time employees.  (Doc. 16 ¶ 131).  Defendants initially contend that, because neither defendant had at least fifteen employees, the court lacks subject matter jurisdiction over Showers's ADA claim and therefore must divest itself of supplemental jurisdiction over her PHRA claim.  (Doc. 18 at 16-17).  Defendants misread controlling authority.  As the Third Circuit made clear in <u>Nesbit v. Gears Unlimited, Inc.</u>, the fifteen-employee numerosity requirement in Title VII actions is <i>not</i> jurisdictional; rather, it is a substantive element of a Title VII claim.  347 F.3d 72, 83 (3d Cir. 2003).[4]  In reaching this holding, the court observed that "the ADA's fifteen-employee requirement is in all relevant respects indistinguishable from Title VII's."  <u>Id.</u> at 77.  Accordingly, the court will not dismiss Showers's ADA claim for lack of subject matter jurisdiction or decline to exercise supplemental jurisdiction over her PHRA claim.

Under certain circumstances, two nominally separate companies that each employ fewer than fifteen individuals may be combined as a "single employer."  When two entities are consolidated in this manner, they share all liabilities.  See <u>In re</u> <u>Owens Corning</u>, 419 F.3d 195, 205 (3d Cir. 2005).  Substantive consolidation is proper (1) when a business divided itself into separate entities for the purposes of

---

[4] To be sure, jurisdictional issues may arise when a claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial or frivolous."  <u>Nesbit</u>, 347 F.3d at 83 (quoting <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 89 (1998)).  Those infirmities are not present in the instant case.

evading liability under anti-discrimination laws; (2) when a parent company directed the discriminatory actions of a subsidiary or when one company ordered the discriminatory actions of the other; or (3) when the "operational entanglement" of two companies is sufficiently pronounced.  <u>Nesbit</u>, 347 F.3d at 85-88.  Factors relevant to the degree of operational entanglement include (1) the identity of ownership, management, and business functions, including the way in which personnel matters are handled; (2) whether the companies present themselves to third parties as a single business; (3) whether the parent company covers the salaries, expenses, or losses of the subsidiary; and (4) whether one company conducts business solely with the other company.  <u>Id.</u> at 87.  No single factor is dispositive of whether two entities should be treated as a single employer.  <u>See id.</u> ("We adopt an intentionally open-ended, equitable inquiry . . . to determine when substantively to consolidate two entities.").  Courts in this circuit apply the foregoing test in the context of ADA claims.  <u>See</u>, <u>e.g.</u>, <u>Kelly v. Horizon Med. Corp.</u>, No. 3:11-CV-1501, 2012 WL 32925, at *4, *8 (M.D. Pa. Jan. 6, 2012).[5]

In <u>Nesbit</u>, the Third Circuit declined to consolidate two automobile manufacturing companies under the single employer test.  Vaughan Winter, Sr. ("Winter") partially owned both companies and monitored operations at each. <u>Nesbit</u>, 347 F.3d at 75.  The companies were located in separate buildings and handled their own financial matters but coordinated with respect to hiring decisions.  <u>Id.</u>  Winter provided input regarding staffing decisions at one of the

---

[5] The court is mindful that substantive consolidation is an equitable remedy that should be granted only in limited circumstances.  <u>See id.</u> at 86.

companies, but personnel decisions were ultimately the prerogative of the day-to-day management at that company. Id. The court found that the companies were not sufficiently interrelated to warrant substantive consolidation. While the companies shared ownership and jointly recruited job applicants, they observed corporate formalities, maintained separate payrolls, did not interact with third parties as a single employer, and did not transact business exclusively with each other. Id. at 88-89. "In the absence of more significant operational entanglement," the court held, "common ownership and de minimis coordination in hiring are insufficient bases to disregard the separate corporate forms of [the two companies]." Id. at 89.

Whether a corporation is an employer within the meaning of the ADA is generally a matter of law for the court to determine. See Tokash v. Foxco Ins. Mgmt. Servs., Inc., No. 3:10-CV-872, 2012 WL 1677437, at *9 (M.D. Pa. May 14, 2012) (applying the single employer test in the context of the Age Discrimination in Employment Act). When the undisputed facts reasonably lead to conflicting conclusions, however, "the determination of the employment status is a question of fact for the fact finder to resolve." Id. (quoting Alba v. Hous. Auth. of Pittston, 400 F. Supp. 2d 685, 692 (M.D. Pa. 2005)). Showers concedes that ECCP and GACP were separately established, that each employs fewer than fifteen individuals, and that the companies did not divide themselves into separate entities for the purposes of evading anti-discrimination laws. (Doc. 16 ¶¶ 125-26, 131, 145; Doc 20

¶¶ 125-26, 131, 145).[6]  Showers argues, instead, that ECCP and GACP are

operationally entangled and should be consolidated for the purposes of satisfying

the ADA's numerosity requirement.  As evidence of relatedness, Showers points to,

*inter alia*, identical ownership, common authority over personnel matters, a shared

website and email domain, and GACP's management of benefits for both companies.

(Doc. 19 at 15).  The court will consider these and other indicia of commonality

under the framework of Nesbit's single employer test.[7]

---

[6] Showers disputes defendants' assertion that "GACP did not direct any
discriminatory action alleged by . . . Showers" on the grounds that Dr. Rowe and Dr.
Werkman are ultimately responsible for major personnel decisions for both ECCP
and GACP.  (Doc 20 ¶ 147).  The court notes, however, that Showers focuses
exclusively on the degree of operational entanglement between ECCP and GACP in
her opposition brief (Doc. 19 at 14-15) and that commonality of ownership and
coordination in personnel decisions are relevant to the operational entanglement
analysis, Nesbit, 347 F.3d at 87.  Accordingly, the court will consider this dispute in
the context of the third—rather than second—prong of the single employer test.

[7] The court notes that two corporations may also be consolidated under the
"joint employer" doctrine.  This distinct test focuses on whether "one employer while
contracting in good faith with an otherwise independent company, has retained for
itself sufficient control of the terms and conditions of employment of the employees
who are employed by the other employer."  Myers v. Garfield & Johnson Enters.,
Inc., 679 F. Supp. 2d 598, 607 (E.D. Pa. 2010) (quoting NLRB v. Browning-Ferris
Indus. of Pa., Inc., 691 F.2d 1117, 1123 (3d Cir. 1982)).  Relevant factors under this
test include (1) the authority to decide personnel matters and set conditions of
employment; (2) day-to-day supervision of employees; and (3) control of employee
records.  Id. (citing Butterbaugh v. Chertoff, 479 F. Supp. 2d 485, 494 (W.D. Pa.
2007)).  When appropriate, a court may apply both tests in assessing a plaintiff's
employment status.  See Gift v. Travid Sales Assocs., Inc., 881 F. Supp. 2d 685, 692
n.10 (E.D. Pa. 2012).  Because Nesbit's single employer test is relevant when a
plaintiff's immediate employer does not itself satisfy the numerosity requirement
under anti-discrimination laws, see Daniel v. City of Harrisburg, No. 1:05-CV-2126,
2006 WL 543044, at *3 (M.D. Pa. Mar. 6, 2006), and the parties here appear to
agree that the single employer framework governs whether ECCP and GACP
should be substantively consolidated, cf. Gorey v. Carpenters Joint Apprentice
Comm., No. 08-5993, 2010 WL 1718288, at *5 n.3 (E.D. Pa. Apr. 27, 2010), the court
will apply only the single employer test in the case *sub judice*.

The first factor relevant to operational entanglement is "the degree of unity between the entities with respect to ownership, management (both directors and officers), and business functions (*e.g.,* hiring and personnel matters)." Nesbit, 347 F.3d at 87. The parties do not dispute that ECCP and GACP have the same ownership. Dr. Rowe and Dr. Werkman are each 50-percent shareholders of GACP and the only members of ECCP. (Doc. 16 ¶¶ 127-28). Both sit on the board of GACP, and Dr. Werkman additionally serves as the state-mandated Medical Director of ECCP. (Id. ¶¶ 127, 133). As directors of GACP and as members of ECCP's Governing Board (along with Farr), Dr. Rowe and Dr. Werkman maintain ultimate control over the management of both businesses. (Designee Dep. at 57:22-58:8). While Farr and Nye are primarily responsible for hiring employees, defendants testified that Dr. Rowe and Dr. Werkman provide input and meet with all applicants before any hiring decisions are made. (Id. at 59:17-60:9). With respect to major disciplinary matters, Dr. Rowe and Dr. Werkman must consent before any employee is dismissed from ECCP or GACP. (Id. at 60:10-61:13).

The record also reveals a significant degree of interconnectedness in terms of employee benefits. Indeed, Dr. Rowe and Dr. Workman make benefits-related decisions for both companies. (Id. at 61:24-62:4). Defendants further testified that, pursuant to a management agreement between ECCP and GACP,[8] GACP manages

---

[8] The management agreement states that GACP shall provide services regarding the negotiation of contracts, clinical billing, payroll management, receipt of deliveries, contracts with vendors and service providers, and payment of joint expenses. (Designee Dep. Ex. 14). These services exclude direct patient contact (with the exception of billing matters) and clinical services. (Id.)

ECCP's health and dental/vision plans.  (Id. at 31:5-35:14).  Although each company makes separate contributions, ECCP utilizes GACP's 401(k) retirement plan.  (Id. at 28:17-29:19).  With respect to billing matters, ECCP and GACP contract with the same payroll agent (id. at 28:11-16), and a GACP employee supervises billing and collections for both companies (id. at 36:18-37:7; see also Doc. 20 ¶ 132).

Common ownership, management, and benefits tend to support substantive consolidation of related employers. Tokash, 2012 WL 1677437, at *8 (citing DeAngelo v. DentalEZ, Inc., No. 09-535, 2011 WL 1496513, at *4 (E.D. Pa. Apr. 15, 2011)).  In Tokash, for example, the court found sufficient operational entanglement when, *inter alia*, two companies were owned by the same family, the same individual served as president and CEO of both companies, employees of both companies were insured under a single health insurance plan, and the same individual—albeit one employed by both companies—handled payroll services for each. Id. at *8-9.  And in DeAngelo, the court found that an affiliated company could be consolidated with plaintiff's employer when the former provided health insurance and other personnel services to the latter and when the same individual owned both companies, among other considerations.  2011 WL 1496513, at *3. Notwithstanding ECCP's and GACP's separate legal statuses and apparent efforts to observe corporate formalities (see Doc. 23 at 14 n.5), the court finds that the degree of unity between ECCP and GACP presents a genuine issue regarding whether the two entities should be treated as a single employer.

Showers also points to evidence that, whether intentionally or not, ECCP and GACP present themselves as a single entity.  First, ECCP and GACP are located in the same building.[9]  The two entities have different reception windows and work areas (Doc. 16 ¶ 141) but share certain common areas, including hallways, bathrooms, a locker room, and a lunchroom (Doc. 20 ¶ 141).  Cf. Blakeman v. Freedom Rides, Inc., No. 12-416-LPS-CJB, 2013 WL 3503165, at *12 (D. Del. July 10, 2013) (determining that temporarily shared office space, *inter alia*, supports substantive consolidation), adopted by No. 12-416-LPS-CJB, ECF No. 35 (D. Del. Mar. 20, 2014).  The reception areas themselves are an apparent source of confusion for visitors; Showers testified that patients frequently went to the wrong window.  (Showers Dep. at 112:11-19 ("The waiting room is very confusing for most patients.")).  The court further observes that while Dr. Rowe and Dr. Werkman work at both ECCP and GACP, their offices are located on GACP's side of the building.  (Designee Dep. at 43:21-44:9).  Cf. DeAngelo, 2011 WL 1496513, at *3 (noting in support of consolidation that the owner of two related companies kept an office only at one of the entities).

Second, the companies' online presence could lead third parties to perceive them as a single entity.  ECCP does not maintain its own website; rather, GACP's website contained a page for ECCP, which included information about directions, endoscopic procedures, and accreditation.  (Designee Dep. Exs. 5-6).  Defendants

---

[9] The building in question is owned by GI Properties of Hershey, LLP, which in turn is jointly owned by Dr. Rowe and Dr. Werkman.  (Id. at 56:13-18; Doc. 16 ¶ 140).

testified that they provided this information on GACP's website "solely as a courtesy" to their patients because "we refer most of our patients from [GACP] for their procedures at ECCP." (Id. at 24:19-25:22). Cf. Gift, 881 F. Supp. 2d at 693 (finding "some evidence" that two companies presented themselves as a single entity on the grounds that one identified the other on its website as one of its offices). More significantly, each ECCP and GACP employee was assigned an email address with the domain "@giacp.com." (Designee Dep. at 46:14-22). Cf. Tokash, 2012 WL 1677437, at *8 (finding it "compelling" under this operational entanglement factor that the employees of two companies used the same email domain, "which could well communicate to the outside world that [plaintiff] was an employee of [the affiliated company]"); Blakeman, 2013 WL 3503165, at *10 (noting that, while the evidence ultimately did not imply that two companies presented themselves as a single entity, the fact that the corporate officers of one used the email domain of the other offered opposing evidence).

Third, the court observes that, unlike GACP, ECCP does not maintain a fax number or answering service. (Farr Dep. at 32:18-20; Showers Dep. at 42:16-23; Doc. 19-5, Werkman Dep. at 32:7-12, Nov. 5, 2013 ("Werkman Dep.")). ECCP has its own phone number, but patients often call the wrong business according to Showers. (Showers Dep. at 43:11-15). Showers testified that these incidents

required her to explain the differences between the two companies and transfer the call to the appropriate location.  (Id. at 43:16-25).[10]

With respect to the third operational entanglement factor, Showers has not adduced evidence that ECCP or GACP covers the salaries or expenses of the other. Indeed, defendants present testimony that each company has had separate lines of credit and that one company's insolvency would not be fatal to the other.  (Designee Dep. at 73:5-74:3).

Finally, a reasonable juror could find a significant degree of exclusivity between ECCP and GACP.  Defendants acknowledge that, with the exception of a nonemployee physician who performed work at ECCP for approximately one year in the past, Dr. Rowe and Dr. Werkman have performed or supervised every procedure at ECCP since its inception.[11]  (Designee Dep. at 40:11-41:14).  Conversely, the lion's share of procedures that GACP refers occur at ECCP.  (Id. at 42:2-18 ("[T]he majority and clearly over 90 percent of our procedures are done at [ECCP]."")).  Dr. Rowe and Dr. Werkman perform all procedures that GACP refers.  (Id. at 42:20-25).

Unlike the companies at issue in Nesbit, ECCP and GACP have increased overlap in management and personnel decisions, share the same building, are more

---

[10] That Showers presents herself to third parties as an employee of ECCP— her nominal employer (Doc. 23 at 14 n.3)—is not dispositive under the single employer test.  The very purpose of this test is to determine "whether two *nominally distinct* entities should be considered as one."  Nesbit, 347 F.3d at 85 (emphasis added).

[11] Defendants' contention that "ECCP did not do business exclusively with GACP when Ms. Showers was terminated in 2011" (Doc. 23 at 14 n.4) is not supported by the sources defendants cite for this proposition, or elsewhere in the record.

likely to be treated as a single unit by third parties, and exhibit a greater degree of operational entanglement. Accepting that certain outsourcing arrangements between ECCP and GACP are similar to the arrangements among other endoscopy centers and endoscopy center management companies in the industry (Doc. 16 ¶¶ 134, 143), the court cannot ignore the considerable other ways in which ECCP and GACP, in particular, are related. While ECCP and GACP operate as separate entities in many respects—and thus a reasonable juror could conclude that they are not sufficiently interconnected to form a single employer—their interactions are far from *de minimis* (cf. Doc. 23 at 13).

Viewing the evidence in the light most favorable to Showers, the court finds a genuine issue of material fact regarding whether ECCP and GACP should be consolidated as a single employer for the purposes of the ADA. When so consolidated, the total number of employees at the relevant time would exceed fifteen, satisfying the ADA's numerosity requirement. (See Doc. 16 ¶ 131). Accordingly, the court will deny summary judgment to the extent that defendants argue that neither ECCP nor GACP is an "employer" within the meaning of the ADA.

**B. GACP's Liability Under the Single Employer Framework**

Defendants argue that Showers's ADA claim against GACP fails because Showers does not allege that GACP was responsible for her termination. (Doc. 18 at 20). While it is undisputed that Showers does not aver that GACP itself discriminated against her (Doc. 16 ¶ 146; Doc. 20 ¶ 146), defendants misinterpret

19

the outcome of the single employer test.  As the Third Circuit clarified, "[w]hen courts substantively consolidate two entities, they treat the assets and liabilities of each as belonging to a single entity."  Nesbit, 347 F.3d at 86.  In DeAngelo, for example, a company affiliated with the plaintiff's nominal employer moved for summary judgment on the grounds that it did not employ the plaintiff and could not be consolidated with her employer.  2011 WL 1496513, at *1.  After finding issues of material fact as to whether plaintiff's employer and the affiliated company could be combined as a single employer, the court rejected the affiliated company's contention that it could not be held liable for the alleged discrimination.  Id. at *4.  Other courts in this circuit have similarly concluded that single employer status extends liability.  See, e.g., Gift, 881 F. Supp. 2d at 692 (noting that a company affiliated with plaintiff's employer could be held liable for the alleged discrimination if the employer and affiliated company constituted a single employer); Tokash, 2012 WL 1677437, at *6 ("There are certain situations in which employees can be aggregated between nominally distinct employers for the purposes of establishing the requisite size for [anti-discrimination statute] *liability*." (emphasis added)); Dobrick-Peirce v. Open Options, Inc., No. 2:05CV1451, 2006 WL 2089960, at *3 (W.D. Pa. July 25, 2006) ("Assuming *arguendo* that all of the Corporate Defendants are to be treated as one employer, NetFx, as one of the Corporate Defendants,

would be considered an employer of all employees of the Corporate Defendants.").[12]

Because the court finds a genuine issue of material fact regarding whether ECCP

and GACP may be substantively consolidated under the single employer test, it will

decline to dismiss Showers's disability discrimination claims against GACP on the

sole ground that GACP—when viewed as a separate entity—did not discriminate

against Showers.

### C.   Disability Discrimination Claims

Defendants argue that Showers cannot establish her *prima facie* case under

the ADA because she is not disabled within the meaning of the ADA and because

she has not demonstrated that ECCP terminated her on account of any disability.

(Doc. 18 at 20-22).  Defendants further contend that, even if Showers could satisfy

her *prima facie* case, she has not shown that ECCP's justification for her

termination was pretext for discrimination.  (Id. at 22-24).  Showers counters that

she had an actual disability under the ADA and that ECCP regarded her as

disabled.  (Doc. 19 at 16-19).  She also asserts that she has met her *prima facie* case

under the ADA and that the proffered reasons for her termination were pretextual.

(Id. at 19-23).

---

[12] In Thomas v. Centennial Communications Corp., the district court noted
that some courts in this circuit have questioned whether the single employer test
can be used to establish liability in addition to numerosity, and reasoned that
Nesbit addressed statutory eligibility rather than joint liability.  2014 WL 4377734,
at *2 (D.V.I. Sept. 4, 2014).  The cases that the court cites in support of this
proposition, however, concerned application of the joint employer test or scenarios
in which it was undisputed that the corporate defendants employed the threshold
number of individuals.  Thomas is therefore wholly inapposite to the instant matter.

When, as here, alleged discrimination is based on circumstantial evidence,[13] courts apply the burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-06 (1973).  <u>See</u> <u>Unangst v. Dual Temp Co.</u>, No. 10-6811, 2012 WL 931130, at *5 (E.D. Pa. Mar. 19, 2012).  Under this framework, a plaintiff carries the initial burden of demonstrating a *prima facie* case of unlawful discrimination.  <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994).  If the plaintiff establishes her *prima facie* case, the burden of production shifts to the employer to articulate a legitimate and nondiscriminatory reason for its adverse employment decision.  <u>Id.</u>  Assuming that the employer is able to meet its "relatively light burden," the burden of production shifts back to the plaintiff.  <u>Id.</u>  The plaintiff must then show by a preponderance of the evidence that the employer's reason for the adverse employment action is pretextual.  <u>Id.</u>[14]

### 1.    *Showers's* Prima Facie *Case*

To establish a *prima facie* case of disability discrimination under the ADA or PHRA, a plaintiff must demonstrate "(1) that [s]he is disabled within the meaning of the ADA, (2) that [s]he is otherwise qualified for the job, with or without reasonable accommodations, and (3) that [s]he was subjected to an adverse employment decision as a result of discrimination." <u>Sulima v. Tobyhanna Army</u>

---

[13] <u>See</u> <u>Munoz v. Nutrisystem, Inc.</u>, No. 13-4416, 2014 WL 3765498, at *4 n.5 (E.D. Pa. July 30, 2014) ("Because the termination was premised on attendance, however, not on her disabilities directly, [plaintiff's] argument does require an inference of discriminatory animus.").

[14] The burden of persuasion rests with the plaintiff throughout this framework.  <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 143 (2000) (quoting <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981)).

Depot, 602 F.3d 177, 185 (3d Cir. 2010) (citing Taylor v. Phoenixville Sch. Dist., 184

F.3d 296, 306 (3d Cir. 1999)); accord Buskirk v. Apollo Metals, 307 F.3d 160, 166 &

n.1 (3d Cir. 2002) (noting that courts generally construe the PHRA in a manner

consistent with federal anti-discrimination statutes).  Defendants argue that

Showers has not satisfied the first and third elements of her *prima facie* case.  (Doc.

18 at 20-22).

### a.    Disability Under the ADA

The ADA defines a "disability" as "[1] a physical or mental impairment that

substantially limits one or more major life activities of such individual; [2] a record

of such an impairment; or [3] being regarded as having such an impairment."  42

U.S.C. § 12102(1).[15]  A plaintiff is disabled within the meaning of the ADA only if

she had a disability at the time of the adverse employment decision.  Rahsman v.

Dewberry-Goodkind, Inc., No. 1:05-CV-1931, 2007 WL 188571, at *6 (M.D. Pa. Jan.

22, 2007).  In 2008, Congress passed the ADA Amendments Act ("ADAAA"), which

emphasized that the ADA "shall be construed in favor of broad coverage of

individuals" and expanded the rules of construction governing the definition of

disability.  ADA Amendments Act of 2008, Pub. L. No. 110-325, § 4(a), 122 Stat.

3553, 3555.  Because the events at issue in the instant matter occurred after

---

[15] Major life activities under the ADA include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).  Major life activities also extend to major bodily functions, including "functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions."  Id. § 12102(2)(B).

January 1, 2009, the effective date of the ADAAA, these amendments apply to Showers's ADA claim. See Gaus v. Norfolk S. Ry. Co., No. 09-1698, 2011 WL 4527359, at *11 (W.D. Pa. Sept. 28, 2011).

There can be little doubt that a medical condition as serious as cancer may substantially limit major life activities. See Unangst, 2012 WL 931130, at *4 ("The ADA was clearly intended by Congress to protect cancer patients from disability discrimination."). In the instant matter, defendants concede that Showers was diagnosed with colon cancer in January 2011 and underwent laparoscopic surgery to remove the tumor as part of a curative resection. (Doc. 16 ¶ 31). Defendants also acknowledge that, as a result of her operation, Showers was on medical leave for approximately six weeks before her physician cleared her to return to work on a part-time basis. (Id. ¶ 34). Since February 2011, Showers's colon cancer has been in remission; she does not require additional treatment other than yearly check-ups. (Id. ¶ 39). Defendants contend that because Showers had recovered from her cancer surgery at the time of her termination—and because Showers's physician had confirmed that she could return to work without restrictions after her subsequent recovery from GBS (id. ¶ 52)—Showers was not disabled within the meaning of the ADA. (Doc. 18 at 21).

The 2008 amendments to the ADA provide that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D). Cancer is such an impairment. Indeed, the legislative history of the ADAAA indicates that the Act intended to

counter earlier cases that had "discounted the impact of an impairment [such as cancer] that may be in remission as too short-lived to be substantially limiting." 29 C.F.R. § 1630 app. (alteration in original).

In the case *sub judice*, ECCP terminated Showers approximately four months after Showers returned to work following her surgery.  Although Showers's cancer is presently in remission, it could substantially limit major life activities when active. Cf. Unangst, 2012 WL 931130, at *4 (determining that plaintiff's cancer, while in remission at the time of her termination, constituted a disability under the ADA); Chalfont v. U.S. Electrodes, No. 10-2929, 2010 WL 5341846, at *9 (E.D. Pa. Dec. 28, 2010) (finding that plaintiff had sufficiently alleged a disability when he averred that his cancer, while in remission, was a lifelong condition); Katz v. Adecco USA, Inc., 845 F. Supp. 2d 539, 548 (S.D.N.Y. 2012) (citing cases that have reasoned that cancer in remission may nevertheless qualify as a disability under the ADA).  The court finds that Showers presents a genuine issue regarding whether she was disabled within the meaning of the ADA and will therefore decline to dismiss her ADA claim on this basis.[16]

### b.    Disability Under the PHRA

The parties do not separately consider whether Showers has demonstrated that she was disabled within the meaning of the PHRA.  While the PHRA's definition of disability largely tracked the ADA's prior to the ADAAA, Pennsylvania

---

[16] Because a reasonable juror could conclude that, at the time of her termination, Showers had an actual disability or a record of a disability within the meaning of the ADA, it is unnecessary to address whether ECCP regarded Showers as disabled under the ADA.

has not similarly expanded the meaning of disability under the PHRA. Rubano v. Farrell Area Sch. Dist., 991 F. Supp. 2d 678, 689 n.7 (W.D. Pa. 2014). In disability discrimination cases predicated on conduct that occurred after January 1, 2009 where disability status is at issue, therefore, courts in this circuit have applied the pre-ADAAA standard to PHRA claims. Id. (citing cases); Rocco v. Gordon Food Serv., 998 F. Supp. 2d 422, 428 (W.D. Pa. 2014) (same). This court will too.

With respect to Showers's actual disability claim, the PHRA contains no provision analogous to the ADAAA's rule of construction regarding impairments that are episodic or in remission. See 43 PA. CONS. STAT. § 954(p.1). Showers has not proffered evidence that her cancer or GBS substantially limited any major life activities at the time of her termination and concedes that neither illness significantly affected her as of May 2011. (See Showers Dep. at 66:11-67:18, 177:11-19). Accordingly, the court concludes that Showers does not present a genuine issue regarding whether she was disabled or had a record of a disability[17] under the PHRA. Cf. Fields v. Verizon Servs. Corp., No. 10-CV-02484-AW, 2011 WL 4102087, at *5 (D. Md. Sept. 13, 2011) (finding that plaintiff was not disabled within the meaning of a local anti-discrimination statute because that statute, unlike the ADAAA, did not extend to medical conditions that are in remission), aff'd, 493 F. App'x 371 (4th Cir. 2012) (per curiam).

---

[17] To establish a record of a disability, a plaintiff must demonstrate that the recorded impairment constitutes an actual disability. See Rahsman, 2007 WL 188571, at *7 (citing Tice v. Ctr. Area Transp. Auth., 247 F.3d 506, 512 (3d Cir. 2001)).

Showers's "regarded as" disability claim under the PHRA also cannot survive summary judgment.  A claim that an employer regarded an employee as disabled focuses on the "reactions and perceptions" of the employer; the employee need not have an actual impairment to state a disability discrimination claim.  Kelly v. Drexel Univ., 94 F.3d 102, 108-09 (3d Cir. 1996).  An employer's mere awareness of an impairment, however, is insufficient to establish that it regarded the employee as disabled.  Id. at 109.  Prior to the ADAAA, to establish that her employer regarded her as disabled, a plaintiff had to show that (1) she had an impairment that did not substantially limit major life activities but was treated by her employer as having such an impairment; (2) she had an impairment that substantially limited major life activities as a result of the attitudes of others regarding the impairment; or (3) she had no impairment but was treated by her employer as having a substantially limiting impairment.  Taylor v. Pathmark Stores, Inc., 177 F.3d 180, 187 (3d Cir. 1999); see also Fallecker v. Slippery Rock Univ., State Sys. of Higher Educ., No. 1929 C.D. 2007, 2008 WL 9399222, at *6 (Pa. Commw. Ct. July 28, 2008) ("Under the correct [PHRA] standard, an employee may be characterized as disabled under the 'regarded as' disabled prong . . . if the employee is able to establish that the employer regarded the employee as having an impairment that substantially limits any major life activity regardless as to whether that perception is accurate.").

The ADAAA broadened the scope of disability by providing that a plaintiff may establish that her employer regarded her as disabled merely by showing that

the employer subjected her to an adverse employment action on the basis of an actual or perceived impairment; whether the employer believed that any impairment substantially limited the plaintiff's major life activities is no longer dispositive under the ADA.  42 U.S.C. § 12102(3)(A); <u>see</u> <u>also</u> <u>Hohider v. United Parcel Serv., Inc.</u>, 574 F.3d 169, 188 n.17 (3d Cir. 2009).  The PHRA was not similarly amended and therefore should be construed in accordance with the pre-ADAAA standard for "regarded as" disability.  <u>Rubano</u>, 991 F. Supp. 2d at 693-94.

Showers contends that ECCP regarded her as disabled because it was aware that she had been diagnosed with colon cancer and GBS, because Farr expressed some concern about whether Showers would be able to perform her job duties or be a liability after recovering from GBS, and because Farr suggested that ECCP evaluate Showers regularly upon her return.  (Doc. 19 at 18-19).  This evidence would not permit a reasonable juror to conclude that ECCP perceived Showers's medical conditions as substantially limiting any major life activities.  While Farr initially recommended that Showers be evaluated on a weekly and then monthly basis due to concerns regarding her data entry and motor skills (Farr Dep. at 81:7-84:2, Ex. 21), ECCP did not act on this recommendation (<u>id.</u> at 81:24-82:7).  Farr testified that she proposed these evaluations based on her prior experiences with employees returning from leave under the Family Medical Leave Act.  (<u>Id.</u> at 82:8-83:10; <u>see</u> <u>also</u> Werkman Dep. at 64:16-66:3 ("[T]here was no need to do anything out of the ordinary in terms of allowing Ms. Showers to return to work or create some special program for her for continued follow-up.  We treated her like

any other employee in the practice.")).  Nor did ECCP require Showers to undergo a formal, independent evaluation.  Dr. Rowe explained that ECCP ultimately determined that no such evaluation was necessary in light of the medical release from Showers's physician.  (Doc. 19-4, Rowe Dep. at 84:16-84:22, Oct. 17, 2013 ("Rowe Dep.")).

Showers does not clearly identify which major life activity ECCP perceived that her impairment substantially limited in June 2011.  To the extent that Showers relies on the major life activity of "working,"[18] she fails to present a genuine issue of material fact for trial.  An impairment substantially limits the major life activity of working only if the plaintiff is unable to work in a "broad class of jobs," as opposed to at any particular job.  Provence v. Avon Grove Charter Sch., No. 07-659, 2008 WL 2928314, at *8 (E.D. Pa. July 28, 2008) (quoting Tice, 247 F.3d at 512).  In Quinn v. Mercy Fitzgerald Hospital, the district court concluded that a human relations director's comment that an employee's disability presented a liability to the employer, without more, did not establish that the employer regarded the employee substantially limited in the activity of working.  No. 09-4327, 2011 WL 2982324, at *3 (E.D. Pa. July 22, 2011).  And in Rahsman, this court found that an employer's concern about the quality of an employee's writing after a stroke did not support a finding that the employer regarded the employee as substantially limited in any major life activity.  2007 WL 188571, at *9.  In the instant matter,

---

[18] Showers claims that the evidence she proffers in support of her "regarded as" disability claim "indicate[s] that Ms. Farr regarded or perceived Ms. Showers as being disabled and limited in her ability to be steady on her feet and *perform her work* upon return from GBS."  (Doc. 19 at 18-19) (emphasis added).

Showers has not adduced evidence from which a reasonable juror could infer that ECCP believed that she was substantially limited in her ability to work at ECCP after her return, let alone at a wider range of jobs.  ECCP's short-lived concerns regarding Showers's motor skills and safety are insufficient to create a genuine issue for trial.  Accordingly, the court will grant defendants' motion for summary judgment as to Showers's PHRA claim.

> ### c.   Adverse Employment Decision as a Result of Discrimination

The parties do not contest whether Showers suffered an adverse employment action when ECCP terminated her in June 2011 but dispute whether Showers has demonstrated a causal connection between her termination and her disability.[19] Showers asserts that Farr sought to terminate her because Farr viewed her as a "liability" to ECCP after her return to work.  (Doc. 19 at 20).  According to Showers, Farr adopted a "harassing nature" and was routinely critical of Showers's performance.  (Showers Dep. at 61:1-11, 74:16-75:1).  Farr allegedly criticized Showers's tone of voice, manner of speaking with patients, and filing accuracy.  (Id. at 61:6-62:15).  Showers further testified that Farr pressured her to return to work

---

[19] The court acknowledges the existence of authority that suggests a plaintiff need not establish causation as part of her *prima facie* case.  See, e.g., Armstrong v. Burdette Tomlin Mem'l Hosp., 438 F.3d 240, 251 (3d Cir. 2006).  As the Third Circuit has clarified, the causation inquiry under the *prima facie* case "is not easily distinguishable" from the subsequent analysis of pretext.  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 286 (3d Cir. 2000).  In the interest of completeness, and because the McDonnell Douglas framework does not require that courts "ration the evidence between one stage or the other," Farrell, 206 F.3d at 286, this court will not limit its consideration of the parties' causation arguments to the pretext stage.

after her cancer surgery and made numerous calls to her or her family during her recovery from GBS inquiring when Showers would return.  (Id. at 70:18-75:7, 290:6-23).  Showers also points to a May 5, 2011 email from Farr to Dr. Rowe and Dr. Werkman in which Farr recommended that ECCP evaluate Showers after her return in order to protect ECCP and questioned whether Showers's efforts to contact a coworker about Showers's employment status, rather than Farr, constituted insubordination.  (Doc. 20 ¶ 109; Farr Dep. at 84:11-85:10, Ex. 21).

The record contains scant evidence from which a reasonable juror could conclude that Showers's disability was causally related to her termination.  Showers concedes that Dr. Rowe and Dr. Werkman did not discriminate against her; she ascribes discriminatory animus only to Farr.  (Showers Dep. at 252:7-21).[20]  With respect to Farr's "nitpicking," Showers acknowledges that some of Farr's criticisms, including comments related to filing errors, were valid.  (Id. at 62:20-63:22).  Importantly, Showers cannot identify any specific instances of *unfair* criticism.  (Id. at 63:12-18).  And notwithstanding Showers's testimony that she felt pressured to return to work while on medical leave, she admits that Farr had a legitimate,

---

[20] Defendants argue that Showers cannot impute to ECCP any discriminatory animus on the part of Farr because the Governing Board unanimously terminated her.  (Doc. 18 at 24).  Showers disputes this assertion, however, and avers that Farr improperly influenced the Governing Board's decision by failing to speak with Showers about the reasons for her absence and by presenting only Farr's version of the incident to the Board.  (Doc. 20 ¶ 120).  The court cannot dismiss Showers's ADA claim, as a matter of law, because it is undisputed that Dr. Rowe and Dr. Werkman were parties to the adverse employment decision.  See Staub v. Proctor Hosp., 131 S. Ct. 1186, 1194 (2011) (holding that when a supervisor motivated by discriminatory animus intends to subject an employee to an adverse employment decision, the employer may be held liable to the extent that the supervisor's actions were a proximate cause of the employment decision).

staffing-related reason to inquire periodically about the status of her leave, at least prior to acquiring information about her return date.  (Id. at 76:7-20; Doc. 20 ¶ 106). Contrary to Showers's claim, the record does not support a finding that, one month before her termination, Farr "expressed her desire to get rid of Ms. Showers after her return from GBS." (Doc. 19 at 20).  At most, Farr's May 5, 2011 email suggests that Farr had concerns about Showers's ability to perform her job duties upon her return as well as any concomitant liabilities that she may have presented to herself or ECCP.  (See Farr Dep. Ex. 21).  ECCP approved Showers's request to return in May 2011 and all of her earlier requests for leave.  (See, e.g., Showers Dep. Exs. 13, 15, 17).  Cf. Dove v. Cmty. Educ. Centers Inc., No. 12-4384, 2013 WL 6238015, at *15-16 (E.D. Pa. Dec. 2, 2013) (finding no inference of bias on the part of a supervisor who allegedly criticized plaintiff's appearance after plaintiff returned from medical leave and noting that there was no evidence that the supervisor had rejected plaintiff's requests for leave or vacation).  Moreover, the mere fact that Farr internally questioned whether Showers committed insubordination when she contacted a coworker on multiple occasions about her employment status is hardly indicative of bias.  (See Farr Dep. at 84:11-85:6).

In light of the weak evidence linking her termination with any disability discrimination, the court is skeptical that Showers presents a genuine issue of material fact regarding whether her disability played a role in her termination. Because the court ultimately finds that Showers has failed to demonstrate that ECCP's proffered reasons for her termination were pretextual, it will assume,

*arguendo*, that Showers has satisfied her *prima facie* case and proceed to the next step of the <u>McDonnell Douglas</u> analysis.[21]

### 2.    *Defendants' Legitimate, Nondiscriminatory Reason for Showers's Termination*

Assuming that Showers has established her *prima facie* case of disability discrimination, the burden of production shifts to defendants to articulate a legitimate, nondiscriminatory reason for their decision to terminate Showers. Specifically, defendants must introduce evidence that, "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." <u>Fuentes</u>, 32 F.3d at 763.

Defendants have satisfied their burden.  ECCP asserts that it terminated Showers on June 17, 2011 for failing to report to work on June 14, 2011 or to inform ECCP of her absence pursuant to company policy.  (<u>See</u> Showers Dep. Ex. 20).  In so doing, ECCP took into account previous disciplinary violations.  (Doc. 16 ¶¶ 94-95). This justification, if true, is a proper basis for termination.  <u>See</u> <u>Mathias v. Allegheny Valley Sch.</u>, 560 F. Supp. 2d 354, 360 (E.D. Pa. 2008) (concluding that the

---

[21] Defendants contend that Showers cannot identify any similarly situated employees who were treated more favorably than her for violations of ECCP's call-off or confidentiality policies.  (Doc. 18 at 21-22; Doc. 23 at 18).  Showers disputes this assertion and asserts that information about other employees' disciplinary violations was not available to her.  (Doc. 20 ¶ 117).  The court observes that while more favorable treatment of similarly situated employees may buttress a plaintiff's *prima facie* case under the ADA, it is not a required element of her *prima facie* case. <u>Shaffer v. Greater Hazleton Health Alliance</u>, No. 3:12-CV-02450, 2013 WL 2443931, at *3 n.3 (M.D. Pa. June 5, 2013) (quoting <u>Matczak v. Frankford Candy & Chocolate Co.</u>, 136 F.3d 933, 939 (3d Cir. 1997)).

employer, which asserted that it terminated plaintiff for failing to report to work or notify her supervisor that she would be absent, proffered a legitimate and nondiscriminatory reason for its adverse employment action).[22]

### 3.   *Pretext*

After the employer has articulated a legitimate and nondiscriminatory reason for its adverse employment decision, the employee may defeat summary judgment by identifying evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764.  A plaintiff cannot discredit an employer's proffered basis for termination merely by showing that the employment decision was wrong or mistaken.  Id. at 765.  Rather, the plaintiff must show that the reasons for the employment decision are beset by "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" such that a reasonable factfinder could find the justification "unworthy of credence." Id. (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)).  This burden is difficult to meet.  Id.

In the instant matter, Showers maintains that she has identified evidence sufficient to discredit ECCP's proffered reason for her termination.  She argues that

---

[22] The court notes that, according to Dr. Rowe, ECCP previously sought to terminate an employee who purportedly violated the attendance policy.  (Rowe Dep. at 32:25-33:13 ("We had a part-time employee who was terminated for no show and no call. . . .  He handed in a letter of resignation on the date he was to be terminated.  We accepted his resignation.")).

Farr "was looking for a reason to get rid of Showers" upon her return from GBS, that Farr "manipulated" the Governing Board's decision to terminate Showers, and that Showers's performance became an issue only after she returned from medical leave. (Doc. 19 at 22). Viewing the evidence in the light most favorable to Showers, these arguments fall short of demonstrating pretext.

As the court suggested in connection with Showers's *prima facie* case, the record would not permit a reasonable juror to infer that Farr sought to terminate Showers upon her return from GBS. Showers centers her pretext argument on her belief that Farr sought to dismiss her because she viewed Showers as a liability.[23] Subjective beliefs that are not supported by evidence in the record are insufficient to establish pretext. James v. Sutliff Saturn, Inc., 468 F. App'x 118, 121 (3d Cir. 2012) (nonprecedential) ("[Plaintiff's] unsupported belief that he was fired for discriminatory reasons 'falls far short of establishing pretext.'" (quoting Sarullo v. U.S. Postal Serv., 352 F.3d 789, 800 (3d Cir. 2003))); Tolan v. Temple Health Sys. Transp. Team, Inc., No. 09-CV-5492, 2013 WL 706049, at *18 (E.D. Pa. Feb. 26, 2013) ("In the end we are left only with [plaintiff's] subjective belief that she was

---

[23] Showers testified as follows:

> Question: So your testimony in support of your claim of disability discrimination is based on your impression that Mrs. Farr wanted to get rid of you because you were a liability to the center due to your absence from the workplace during your medical leave?
>
> Answer: Yes.
>
> Question: That's the only basis?
>
> Answer: I would say that's enough. I'm gone.

(Showers Dep. at 267:13-20; see also id. at 166:18-167:16).

discriminated against, and that is not enough to survive summary judgment."),

aff'd, 557 F. App'x 132 (3d Cir. 2014); Cooper v. PricewaterhouseCoopers, No.

07-1399, 2008 WL 4441993, at *5 (E.D. Pa. Sept. 30, 2008) ("Plaintiff's beliefs,

without more, are insufficient to support a claim of pretext."). The evidence that

Showers points to in support of her impression is limited to her own assertions and

testimony (see Doc. 20 ¶ 110) and would not cause a reasonable juror to disbelieve

ECCP's stated reasons for dismissal or believe that Showers's termination was

based on discriminatory criteria. See Werner v. Warrell Corp., No. 1:09-CV-1444,

2012 WL 2979026, at *2 (M.D. Pa. July 20, 2012).

Showers also contends that Farr improperly influenced the Governing

Board's decision-making process by failing to consult Showers about her absence

and by presenting her version of the events to the Board. (Id. ¶ 120). To be sure,

the evidence shows that Farr did not inquire why Showers failed to contact Farr

about her absence on June 14, 2011. (Farr Dep. at 118:10-25). And Dr. Werkman

acknowledges that he considered the facts regarding Showers's absence as they

were presented to him at the termination meeting. (Werkman Dep. at 79:2-16). An

employee cannot discredit an employment decision solely by showing that the

employer did not review all information potentially relevant to that decision, so long

as the employer's decision was nondiscriminatory and made in good faith. See

Parker v. Verizon Pa., Inc., 309 F. App'x 551, 558 (3d Cir. 2009) (nonprecedential);

Garvin v. Progressive Cas. Ins. Co., No. 5:08-CV-3758, 2010 WL 1948593, at *7

(E.D. Pa. May 10, 2010). In the instant matter, Dr. Werkman testified that he had

been made aware that Showers notified another ECCP employee about her absence but explained that this effort did not influence his decision to terminate Showers. (Werkman Dep. at 73:7-20).  Both Dr. Werkman and Farr testified that the Governing Board did not consider Showers's health issues in connection with the Board's termination decision.  (Id. at 90:15-21; Farr Dep. at 116:24-117:2).

In any event, the record reveals that—contrary to Showers's initial belief— Farr was in fact scheduled to work on June 14, 2011 and therefore was the appropriate employee to notify regarding absences.  (Showers Dep. Ex. 19). Showers testified that while she reviewed the staff schedule before she left work on June 13, 2011 and believed that Farr was off the following day, she was apparently mistaken in that belief.  (Id. at 199:16-200:19).[24]  Showers further testified that ECCP employees were informed whom to contact in the event that Farr was unavailable but that she received no such information about June 14, 2011.  (Id. at 216:19-217:6).  While the record reveals a genuine dispute regarding whether Farr instructed Showers not to call her before 8:00 a.m. on her days off (see Showers Dep.

---

[24] Showers notes that the staff schedule does not affirmatively indicate which days Farr was scheduled to work during Farr's intermittent sick leave.  (Doc. 20 ¶ 82).  As Farr explained, however, her shift information is never completed on the staff schedule given her position as the Center Director.  (Farr Dep. at 101:21-102:4).  Furthermore, the only shift that Showers avers is inconsistent with the prospective June 2011 schedule is her own on June 14, 2011.  (See Doc. 20 ¶ 82).

at 182:7-183:15; Farr Dep. at 96:15-98:18), this dispute is immaterial to the instant action in light of Farr's status on June 14, 2011.[25]

Finally, Showers argues that ECCP's position on her declining performance in 2011 was pretextual. (Doc. 19 at 20-21). She notes that she received only one written disciplinary warning in 2011 prior to her termination and that her most recent annual performance appraisal was positive. (Id.) Showers does not dispute that she received two disciplinary warnings in the past for confidentiality issues and one for violation of ECCP's attendance policy in 2007. (Doc. 16 ¶¶ 14-17; Doc. 20 ¶¶ 14-17). She also does not dispute that her previous attendance-related violation stated that further violations of the attendance policy would result in dismissal. (Doc. 16 ¶ 18; Doc. 20 ¶ 18). The mere fact that there was a gap between Showers's last attendance-related violation and her disciplinary issues in 2011 is insufficient to establish pretext. See Outten v. Genesis Health Care, LLC, No. 13-4708, 2014 WL 3964918, at *11 (E.D. Pa. Aug. 12, 2014) (noting that the ADA

---

[25] The court notes that while the Governing Board meeting minutes from June 16, 2011 and Showers's termination letter state that Showers committed "willful misconduct" in failing to report to work or to inform Farr of her absence (Farr Dep. Exs. 29-30), Showers testified that she believed that she had complied with ECCP's attendance policy by contacting the appropriate employee in Farr's stead (Showers Dep. at 208:10-209:17). Dr. Werkman conceded that he "had no way of knowing [Showers's] intentions" with respect to her compliance with ECCP's call-off policy. (Werkman Dep. at 81:3-6). This potential dispute is also immaterial because, as Dr. Werkman clarified, the decision to terminate Showers was based on ECCP's mere assessment "that company policy was violated." (See id. at 81:6-14). Similarly, Dr. Rowe stated that the Board terminated Showers "[b]ecause she no showed, no called, and this was a subsequent offense." (Rowe Dep. at 90:25-91:6). Farr testified that Showers "willfully violated [the attendance] policy in being a no call/no show for her employment" (Farr Dep. at 112:14-18), but did not specifically address whether Showers intended to violate the call-off policy.

and PHRA are "not intended to be a vehicle for judicial second-guessing of business decisions" (quoting Healy v. N.Y. Life Ins. Co., 860 F.2d 1209, 1216 (3d Cir. 1988))). Moreover, prior evaluations evidencing positive employee performance, standing alone, do not call into question the validity of more recent disciplinary issues when those evaluations are not part of the basis for the termination decision. See Oliver v. Clinical Practices of Univ. of Pa., 921 F. Supp. 2d 434, 450 (E.D. Pa. 2013).

In Oliver—a case with facts analogous to the instant matter—Phyllis Oliver ("Oliver") worked at Clinical Practices of the University of Pennsylvania ("CPUP") as a patient service representative. Id. at 441. Oliver was diagnosed with colon cancer in 2007 and required a medical leave of absence to treat her illness. Id. at 442. In September 2008, one of Oliver's supervisors terminated her for allegedly making a patient upset. Id. Oliver had previously received verbal and writing warnings for violations of CPUP's policies, including CPUP's attendance policy. Id.

Oliver alleged that her termination was pretext for discrimination on the basis of race, age, and disability. Id. at 442, 449-52, 453. With respect to her disability discrimination claim, Oliver argued, *inter alia*, that CPUP's reasons for her termination was contradicted by prior performance reviews, which indicated that she had excellent customer service skills and acted professionally. Id. at 450. The court rejected this argument, holding that when considering the totality of Oliver's disciplinary record, a reasonable juror could not find that CPUP's reasons for her termination were pretextual. Id.

The court acknowledges that whether Showers's allegedly declining performance played a role in her termination is not clear from the record.  The Governing Board minutes from June 16, 2011 reference, among other factors, Showers's "declining job performance since returning back to work May 16, 2011." (Farr Dep. Ex. 29).  Farr explained that these performance issues included her no-show on June 14, 2011 as well as an incident in which Showers purportedly interrupted a conversation between GACP and a patient.  (Id. at 115:2-22).  Dr. Rowe testified, on the other hand, that this reference to Showers's performance concerned only her violation of ECCP's attendance policy.  (Rowe Dep. at 97:24-98:7).  Dr. Rowe confirmed that performance issues—other than Showers's disciplinary record—played no role in his decision.  (Id. at 98:11-99:6).

Notwithstanding this potential inconsistency, Showers must show that *each* of ECCP's reasons for her termination was pretextual.  Fuentes, 32 F.3d at 764. There is little doubt that Showers's absence on June 14, 2011 was the primary reason that ECCP proffered for her dismissal.  Because Showers has not identified evidence from which a reasonable juror could either discredit ECCP's position that Showers's purported failure to comply with ECCP's attendance policy on June 14, 2011 resulted in her termination, or conclude that discrimination was more likely than not a motivating or determinative cause of ECCP's termination decision, she has not met her burden of demonstrating pretext.  That ECCP's decision to terminate Showers may have been unwise or imprudent—given her apparent good-faith effort to notify ECCP of her absence—is not enough to survive summary

judgment.  Id. at 765; see also Werner, 2012 WL 2979026, at *2 ("[T]he Plaintiff must do more than to show that the Defendant was 'wrong or mistaken' in terminating her employment." (citation omitted)).

## IV.  Conclusion

For all of the foregoing reasons, the court will grant defendants' motion for summary judgment.  An appropriate order will issue.


 /S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Judge
Middle District of Pennsylvania


Dated:        November 7, 2014